for the appellate, Timothy Forman. Mr. Mills, I notice you're in the courtroom but you have not been listed as an attorney for the appellee. Are you here to argue for the appellee or simply observing? Just observing, yes, sir. If the court did have questions of you, would you entertain them? Yes, sir. Okay, thank you. Thank you very much. Mr. Forman, you may proceed. Good morning, Your Honors. Good morning. May it please the court, Mr. Mills. Your Honor, I'm here this morning. I'm Timothy Forman. I am counsel for Michelle Waugh, now Michelle Mitchell. I consider it both a privilege as well as an honor to be able to appear here before you today. I'm here today to ask you to reconsider the ruling of the trial court where the trial court found that it was not against the manifest way that the evidence to deny Ms. Waugh's motion to vacate the temporary restraining order and further deny Ms. Waugh an opportunity to remove her child, Gavin Tibbs, to the state of Texas. As Your Honors are well aware of, there is a wealth of authority, if you will, of case law out there. I'm not going to discuss the case law. I simply want to keep my remarks short and just touch briefly upon the five factors. In discussing briefly the five factors, we are aware, as I'm sure you are aware, of the fact that Ms. Waugh's motion to vacate the temporary restraining order did not support the manifest way that the evidence to deny Ms. Waugh's motion to vacate the temporary restraining order. The five factors compose, if you will, a balancing test. Each factor is to be considered, each factor is to be weighed, but not any one specific factor outweighs the other factors. So we have five pots, we take the evidence, we put it in each pot and try to figure out where it lies. There's no question, Your Honors, that the move to Killeen, Texas with Gavin and for Ms. Waugh, Mrs. Mitchell, would enhance the life of Mrs. Mitchell and ergo the life of Gavin Tibbs. The primary emphasis, of course, in the trial court is what is in the best interest of the minor child. Obviously we agree with that. Michelle is now married. She and Gavin would have a stable home life. There's a steady income provided. She's married to a young man in the military. Michelle testified that prior to these proceedings beginning, she earned approximately $7,200 per year. Brandon Mitchell, who is going to be in the service for quite a while, for life probably, is now earning $36,000 a year. So we have a nice steady income. Michelle does not plan on working. She plans on being a stay-at-home mother. This is to the benefit of Gavin in the sense that because of Gavin's special needs, she now has a mother who is going to be home with a minor child and going to be able to ascertain that the schools attended by the minor child and the education provided to the minor child are best suited to his needs. In that vein, Michelle Waugh had located a school down there which there is some testimony indicating that this is a school better suited for young boys or for children who had specific hearing needs. Most importantly, as the cases have indicated, the courts ought to give some deference to the choice. Again, stepping back just briefly, Mrs. Waugh and Mrs. Mitchell and Mr. Tibbs were never married. I think that's important because some of the case law speaks to giving greater deference to the custodial parent in the case of a lack of a marital status. Most importantly, as I was starting to say, Mrs. Waugh and Mrs. Mitchell would not be dependent upon the situation that she was to assist her in raising Gavin. And I know that the appellee has placed a lot of great weight on this and I didn't know that Mr. Mills was not going to argue so I'm going to just put all my arguments together for your honors. Much has been made about the community in which the child resides and I would be a fool to stand before your honors today and say it's not a wonderful community. It is. I thought that Mr. Mark Tibbs was going to be here today and I've met Mr. Mark Tibbs, the paternal grandfather. He's a wonderful man, a very engaging, very nice man, a wonderful man. However, your honors, Mr. Mark Tibbs being the center, if you will, of that community cannot be the focus, or I'm asking should not be the focus of this court's ruling, nor should it have been, as I believe. The father's name is Brenton? Brenton Tibbs is Gavin Tibbs' biological father. Was he supporting the child? He had only just recently begun to pay child support. And that was because the Department of Public Health filed a petition against him? That's correct, your honors. May I proceed? Yes. As I was saying, Mark Tibbs, and I won't take anything away from him, that would be silly of me to do that, he being the center of the community, if you will, in my mind, became the focus of the trial court's ruling. And I understand that the trial court may not want to have interrupted that relationship between Gavin and the paternal grandfather. But this case cannot and should not be about the relationship between the young man and the paternal grandfather. Even if in the trial court's decision-making process he felt it would be in the best interest of the child to remain in the community in Atlanta with his grandfather, would that be proper for the court to have made that determination? No, your honor, I don't feel that. I'll explain why, and I appreciate that. Because I think this really comes down to the focus of the issue here, the focus of this appeal. You know, there's that saying, it takes a village to raise a child, and that's very true. But this child does not need a village to be raised. He has a mother, a stepfather, who I understand is not any part of his focus, but he's going to have a sibling. So he's going to have an opportunity to be part of an intact family elsewhere. There's no denying that, elsewhere. However, having said that, I think the relationship between Gavin Tibbs and Mark Tibbs' grandfather, and the aunts and the uncles, is very important. You can't take that away from this young man. And I think that's one of the purposes of visitation, is to keep these relationships intact, to extend these relationships, and to give this young man a feeling of, he has that second community. It's unfortunate, your honors, that in today's world, we live in decimated families. I practice in Logan County, I work in juvenile, and we live amongst decimated families. And it's sad. And more and more, it's taking communities to raise these children. Because there's only one parent, or no parents. But here we have an opportunity for a young man to be part of an intact family, and yet, through the process of visitation, enjoy a great relationship with the extended community. Didn't the court express concerns about how to arrange a visitation schedule, when the distance between the minor and the father would be 1,500 miles? It's actually, your honors, it's actually 950 miles. I'm sorry. That's all right. 15 hours. I apologize for correcting you. It's 15 hours. Yes, your honor. And that is a practical difficulty. There's no question about that. And that would have to be wrestled with. As your honors are well aware, there has been visitation going on, and right now, because of Mrs. Mitchell's inability to drive because of her pregnancy, her husband, Brandon, has been bringing the boy up here. So far, as I think expressed by the trial court, we have borne all the expenses of the visitation travel to and from. So, yes, that's something that simply has to be worked out. However, the young boy has been up here for the last week or so and is going to remain up here through November. Now, that's going to have to change once he becomes more involved in schooling. But, again, I think that, again, we live in a society where relationships, unfortunately, are long distance. And I think that many a young man, many a young woman, has been raised by an absent father. I was an absent father for 15 years. I traveled every other weekend to see my son. It can be done. And it's unfortunate, but it can be done. And I think it can be done in this case, Your Honor. Certainly the parties are willing to do so. If the trial court's order stands, what choices does your client have? Well, she has custody of the minor child, but she can't remove the minor child. Unfortunately, Your Honor, I think... So she has to decide whether she wants to live in Logan County with her son or live in Texas with her husband and other child. That's correct. I think that's what it comes down to. Or, I don't know, move back to Logan County. She's now three months shy of giving birth. Move back to Logan County and go back to her prior situation where now she has Gavin to care for, a newborn to care for, and goes back to making, as Your Honors are well aware of this economy, goes back to making $600 per month and attempts to support a newborn and Gavin. Was there any evidence at the trial level that her husband could relocate to Illinois? You know, that's an excellent question, Your Honor. I don't know that. He's been in the military for about a year, and it would simply be speculative on my point, but I do recall at one time, or I should say hearsay, I do recall at one time having a conversation, and I think ultimately anybody who's in the military has an opportunity to relocate. But I think the young man is at such a stage or is at that stage in his military career where he's undergoing that first two or three years of training. Is there something in the record that he's going to be deployed next year? He was already deployed, Your Honor. To? He's back. He was deployed to Afghanistan. I believe he's with the military police. That was a difference for the income discrepancy. He went from $46,000 to $36,000. So he's not to be deployed in 2013, I seem to recall referencing the record. And I would apologize if I'm incorrect, Your Honor. I do not recall that. I do not. And again, if I'm incorrect, I apologize. I know he had been deployed for a period of time, but I don't know whether he's going to be. Didn't the trial court also express concern about the stability of the marriage? Yes, the trial court was correct. And it felt that there were some issues with respect to stability. And I think that through the efforts of Mr. Mills, the issue of stability was very thoroughly vetted. I provided affidavits. However, my clients came up and testified. We went through a rather exhaustive hearing. And I think the trial court was correct in conducting that inquiry, but I think ultimately the trial court remained satisfied that Michelle Mitchell has a stable and substantial marriage to a nice young man. Well, maybe I'm, maybe the timing of this is significant, but did your client explain what the Facebook was, I don't remember, was it Facebook or something she told somebody about? We're separated. Yes, she did, Your Honor. She explained that and said, what, we're reconciled, we're back together? I think that, well, actually, no, Your Honor. What happened was we had been, as Your Honors know, the hearing was conducted over, I think, almost a year. And so it was very tumultuous for her and her husband, who was in the service and kept coming back up to assist her. And it was very tumultuous for a young married couple. And I think after one very rough hearing, I ascribe it to blowing off steam. I mean, there were never any proceedings begun. There was never, in my mind, there was never danger, never any danger of the marriage ending. And I think she was blowing off steam. Immature, yes, but we're human. I mean, that's all I can really say. I don't disagree, but if part of your approach is the value of an intact family, which I understand, when you've got somebody, if there is the possibility of redeployment or the need for military police elsewhere, that means that you've got an absent wage earner, absent father, stepfather, and then you couple that with perhaps the trial court remained concerned about credibility issues, about how stable the marriage was. Once you're confronted with somebody saying, I mean, somebody says they're separated, that's different than saying we're going through a rough patch or we're having trouble. So was the trial court entitled to consider that? Yes. And you did, apparently. Obviously, Your Honors, the trial court's entitled to consider whatever it feels is important, and that's certainly one of the factors, and I think the Burke case speaks to that when we talk about the satisfaction, the marital satisfaction of the custodial parent. However, with respect to possible deployment, she would be in Texas and still drawing these salaries. She would be down there a member of a community if he were deployed. That would be the same thing if she was in Atlanta and he was deployed and the marriage was intact. She'd be entitled to whatever the allotment would be for a dependent spouse. That's correct, Your Honor. However, I think where she's in Atlanta, I think the constraints regarding carrying out a long-term marriage, especially given the fact that she's about to give birth, practically, practically, I mean, I know we're talking about the best interest of the minor child, and I continue to focus on that in my thoughts today, but practically are going to make it difficult for this young mother to raise Gavin and raise a newborn and carry out a marriage. I mean, in my mind, her remaining in Atlanta is going to, well, I shouldn't say that, I think it's going to put such strain on the marriage that we're going to find out that it's really a strong marriage or a weak one. I mean, there's all kinds of marriages out there. On the other hand, if her husband does get deployed, it seems like the relationship that both she and the child had with the grandparent would be very beneficial for both of them to remain in Atlanta, especially if he's overseas. I mean, what's wrong with the trial court taking that into consideration? If there were notice, you know, if he were being deployed in six months or even 2013, again, I could understand the trial court taking notice of that, but again, I don't recall that there was anything regarding deployment. And again, Your Honor, I want to stress to this court, we don't want to do anything to denigrate the relationship that this young man has with his father or his community up here. This is central Illinois, and family members and family memberships and bonds are very, very important and very strong, strong more so than I think in other parts of the country. We're not trying to denigrate that. We're simply saying that let this poor, we're asking that this young child be allowed to go to Texas to live with his mother and the family, and we're going to have to work out something with visitation to make sure that those bonds remain intact and remain a very important part of this young man's life. Unless Your Honors have anything further for me, again, on behalf of myself. If she makes the decision, well, if she makes the decision to go to Texas and live with her husband, what happens to the child? Well, I don't think that's going to happen, Your Honor, because she was granted custody of the child. I don't know. I mean, she's not going to give up custody of the child. My assumption is, not having spoken to my client, my assumption is she would be in a position where she would have to live up here and make ends meet. Do you think the trial court has ordered her to stay in Atlanta? Pardon me? Do you think the trial court has ordered her to stay in Illinois? No, Your Honor. She has the power, does she not, to move to Texas? Yeah, but she can't do that without Gavin. She's not going to do that without Gavin, because who's going to raise Gavin? Basically, you're saying, is she going to surrender custody of her minor child to the father? No. I've read a lot of these cases, and Collingburn seems to indicate to me this is a very detrimental decision that's being forced upon the mother, and we need to give some deference to the mother in this case, not protect visitation rights over custody rights. Your Honor, I couldn't agree with you more so. I think practically the mother ought to be allowed to move the minor child to Texas, and like in so many other instances and cited in so many other cases, we need to wrestle with the issue of visitation. If the mother moved to Texas and left Brandon here, Brandon couldn't stay with his father very well. It's Gavin. No, Gavin wouldn't be able to stay with the father. Gavin, excuse me. So maybe Gavin could stay with his grandfather. Well, now in my mind we're putting grandparents' rights over parental rights, and that concerns me. That's exactly right. What are we balancing here? The rights of the mother against the rights of the father? No. Rights of the mother against the rights of the grandfather. I think that's 100% correct, Your Honor. I think that's, if I could say so, an astute observation. Your Honors, thank you so much. Okay, thank you. Justice Kinnick and Justice Cook, do you have any questions for Mr. Mills? He's indicated he'd be willing to answer them if he did. Mr. Mills, why are you doing this? Why are you not appearing to represent your client? Your Honor, I just recently made the decision to come here today to observe my client. He has limited income, which is a pain in the ass. I'm not charging him for today. I just recently made the decision to come here today to observe my client. Should we take your failure to respond to his arguments as an admission? No, sir. I would respond if that would be supported. I didn't ask for it at the time, so I understand. Any other questions?  Okay, thank you. Thank you, Your Honor. We'll take the matter under advisement, and we will have a decision very quickly.